**OF THE**
**STATE OF DELAWARE**

BONNIE W. DAVID
VICE CHANCELLOR

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DE 19947

Date Submitted: November 19, 2025
Date Decided: December 8, 2025

Michael W. McDermott, Esquire
Periann Doko, Esquire
Berger McDermott LLP
1105 N. Market Street, Suite 1100
Wilmington, DE 19801

Megan Ward Cascio, Esquire
Rachel R. Tunney, Esquire
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street, P.O. Box 1347
Wilmington, DE 19899

RE: *William Brian Derge v. D&H United Fueling Solutions, Inc., et al.*,
C.A. No. 2025-0087-BWD

Dear Counsel:

D&H United Fueling Solutions, Inc. ("D&H") acquired TN Holdings, Inc. ("TN Holdings," and with D&H, "Defendants") and TN Holdings' subsidiary, Tanknology, Inc. ("Tanknology"), in a merger. As part of the sale, D&H required Tanknology's top executives, including its Chief Operating Officer ("COO"), William Brian Derge ("Plaintiff"), to sign restrictive covenant agreements at closing. Plaintiff received nearly $1 million in consideration in exchange for his stock in the merger.

Approximately eighteen months later, Plaintiff filed suit seeking a declaration that the non-compete provision in his restrictive covenant agreement is "void and unenforceable as a matter of law." The parties have cross-moved for

summary judgment on that issue.  For reasons explained below, the Court concludes that the non-compete is enforceable.

## I.  BACKGROUND

### A.  D&H Acquires TN Holdings And Plaintiff Signs A Restrictive Covenant Agreement Containing A Non-Compete.

TN Holdings, a Delaware corporation, is a holding company with its principal place of business in Austin, Texas.  Verified Compl. for Declaratory Relief [hereinafter Compl.] ¶¶ 2, 6, Dkt. 1; Answer to Verified Compl. for Declaratory Relief [hereinafter Answer] ¶¶ 2, 6, Dkt. 4.  TN Holdings owns Tanknology, a Delaware corporation that provides tank testing and environmental compliance services for petroleum systems in the United States and internationally.  Compl. ¶¶ 9–10; Answer ¶¶ 9–10; Unsworn Decl. of Tracy Long [hereinafter Long Decl.] ¶ 4, Dkt. 8.[1]

---

[1] The Court has considered a declaration submitted by Tracy Long, the Chief Executive Officer of D&H, despite Plaintiff's arguments that the Court should disregard the declaration because it was not submitted in the form of a sworn affidavit. *See* 10 *Del. C.* § 5354(a) ("Except as otherwise provided in subsection (b) of this section, if a law of this State requires or permits use of a sworn declaration, an unsworn declaration meeting the requirements of this chapter has the same effect as a sworn declaration."); 10 *Del. C.* § 5356 ("An unsworn declaration under this chapter must be in substantially the following form[.]"); Long Decl. at 1 (complying with form under Section 5356 by "declar[ing] under penalty of perjury under the laws of Delaware that the following is true and correct").

Plaintiff served as Tanknology's COO from June 2015 to July 31, 2024. Compl. ¶ 2; Answer ¶ 2; Long Decl. ¶ 5. In that role, Plaintiff "managed all aspects of the domestic US storage tank compliance business lines" and "negotiated and managed vendor and supplier relationships"—responsibilities that, according to Defendants, made him "a key executive of Tanknology." Compl. ¶ 13; Long Decl. ¶¶ 5–6; *see also* Aff. of Yury Kapko [hereinafter Yury Aff.] ¶ 6, Dkt. 14. Plaintiff also owned 200 shares of Class A common stock and 200 shares of Class B common stock of TN Holdings. Long Decl. ¶ 8. Plaintiff's shares "were non-transferable, were only vested upon sale, and [were] contingent upon employment at the time of the sale." Second Aff. of William Brian Derge [hereinafter Derge Aff.] ¶ 5, Dkt. 12.

On June 30, 2023, D&H acquired TN Holdings in a merger (the "Merger") pursuant to an Agreement and Plan of Merger (the "Merger Agreement"). Long Decl., Ex. A [hereinafter Merger Agt.] at 1; Compl. ¶ 2; Answer ¶ 2. Though Plaintiff's shares represented just 0.73% of TN Holdings' Class A common stock, Plaintiff executed a written consent approving the Merger. Derge Aff. ¶ 5; Merger Agt., Ex. L.[2]  In exchange for his shares in the Merger, Plaintiff received

---

[2] Plaintiff's signature page is attached as an exhibit to the Merger Agreement. Merger Agt., Derge's Signature/Signed Copy of Page 322.

$965,820.07, including $150,000 that he rolled over as equity in the surviving entity.

Derge Aff. ¶ 6; Long Decl. ¶ 9; Yury Aff. ¶ 11.

> The Merger Agreement stated that,
>
> [c]oncurrently with the execution and delivery of this Agreement, and as a condition and inducement to the willingness of [D&H] and [its merger subsidiary] to enter into this Agreement, the Persons set forth on Exhibit B are each executing and delivering a restrictive covenant agreement in the form of Exhibit B-1 (each, a "Restrictive Covenant Agreement" and collectively, the "Restrictive Covenant Agreements"[3]) pursuant to which such Persons agree to certain restrictive covenants pursuant to the terms and conditions set forth therein.

Merger Agt. at 1. Exhibit B listed seven entities or individuals, including Plaintiff.

*Id.*, Ex. B. Section 3.1 of the Merger Agreement required TN Holdings to "deliver

or cause to be executed and/or delivered" the Restrictive Covenant Agreements "[a]t

the [June 30, 2023] Closing." *Id.* § 3.1.

The same day the Merger Agreement was executed, Plaintiff and D&H

entered into a Restrictive Covenant Agreement governed by Delaware law (the

"Agreement").[4] Merger Agt. at 1; *id.*, Ex. B.; Pl. William Brian Derge's Mot. for

Summ. J. [hereinafter Pl.'s Mot.], Ex. 1 [hereinafter Agt.] § 9(b), Dkt. 5. The

---

[3] This letter opinion also refers to the agreements in Exhibit B to the Merger Agreement as the "Restrictive Covenant Agreements."

[4] At the time of the Merger, Plaintiff also executed an Employment Agreement, but that agreement is not in the record. Pl.'s Mot. ¶ 2; *see* Compl. ¶ 2; Answer ¶ 2.

Agreement states that Plaintiff "has agreed to accept certain restrictions as set forth in this Agreement in order to induce [D&H] and [its merger subsidiary] to enter into the Merger Agreement and to consummate the transactions contemplated thereby," and "is indirectly receiving substantial cash payments, significant benefits and other valuable consideration on the Closing Date in connection with the transactions contemplated by the Merger Agreement as the [Plaintiff] is a shareholder of the Company." Agt. at 1.

Section 2 of the Agreement, titled "Non-Competition Covenants," provides as follows:

(a)     As material inducement to [D&H] and [its merger subsidiary] to enter into the Merger Agreement and to consummate the transactions contemplated thereby, [Plaintiff] hereby covenants and agrees for the duration of the Restrict[ed] Period not to, and to cause [Plaintiff]'s Affiliates (if applicable) not to, directly or indirectly:

(i)     own any interest in, manage, control, participate in, consult with, render services for (as a director, officer, employee, agent, broker, partner, contractor, consultant or otherwise) or be or become engaged or involved in any Restricted Business within the Territory, including by being or becoming an organizer, owner, co-owner, trustee, promoter, Affiliate, investor, lender, landlord, partner, joint venturer, stockholder, officer, director, employee, independent contractor, manager, salesperson, representative, associate, consultant, agent, broker, supplier, licensor, analyst or advisor of, to or with any

> Restricted Business (other than with respect to the Company Entities)[;]
>
> (ii) make any investment (whether equity, debt or otherwise) in, lend or otherwise provide any money or assets to, or provide any guaranty or other financial assistance to any Restricted Business within the Territory (other than with respect to the Company Entities); or
>
> (iii) provide any information, assistance, support, good, service or product, technology or Intellectual Property to any Person engaged or involved in any Restricted Business within the Territory (other than with respect to the Company Entities).

*Id.* § 2(a). This letter opinion refers to Section 2(a) of the Agreement as the "Non-Compete."

The Agreement includes the following defined terms referenced in the Non-Compete:

- "Restrict[ed] Period" means "the period commencing on the [June 30, 2023] Closing Date and ending on the fifth anniversary thereof." *Id.* § 1(iv).

- "Affiliate" has "the meaning set forth in the Merger Agreement," *i.e.*, "any other Person controlling, controlled by or under common control with such Person, where 'control' means . . . the power to direct the management and policies of a Person whether through the ownership

of voting securities, its capacity as a sole or managing member or otherwise." *Id.* § 1(i); Merger Agt. § 1.1.

- "Territory" means "the United States and each other country in which [TN Holdings or its subsidiaries] generated revenue in the two . . . year period prior to [June 30, 2023]." Agt. § 1(v).

- And "Restricted Business" means:

  any Person, business, activity, enterprise or venture that conducts all or any portion of the business conducted by the Company Entities as of the date hereof, including the business of (a) testing, permitting, inspecting, cleaning, assessing, reviewing, reconditioning, repairing, replacing, distributing, remote monitoring, installing and certifying systems, assemblies and subassemblies of fueling and inspection equipment, components and parts of fueling stations, fuel storage systems, underground and above-ground storage tanks, including for retail (including grocery and convenience store) and other non-retail (including commercial fleet and transportation and healthcare) customers, (b) training technicians related to the foregoing services, (c) providing services and software solutions related to the foregoing, including in-person and remote monitoring or inspection services, spill containment services, and a proprietary enterprise system that provides work order management mechanisms, including dispatching, reporting and invoicing services pertaining to fueling systems, (d) manufacturing testing equipment related to the foregoing services, and (e) the installation, service, repair, calibration and testing of EV charging systems.

*Id.* § 1(iii).

To summarize, the Non-Compete prohibits Plaintiff, for a period of five years after closing, from owning any interest in, managing, controlling, participating in, consulting with, rendering services for, or becoming engaged or involved with a business engaged in activities concerning fuel storage anywhere in the United States and each other country in which TN Holdings generated revenue in the two-year period before the Merger.

**B.     Plaintiff Leaves Tanknology And Seeks Employment With A Competitor.**

Plaintiff remained employed by Tanknology after the Merger.  On May 14, 2024, Plaintiff resigned from his employment at Tanknology, effective July 31. Compl. ¶¶ 19–20; Answer ¶¶ 19–20; Long Decl. ¶ 13.

Prior to Plaintiff's departure, D&H learned that Plaintiff had sought new employment with a competitor, nonparty Source North America Corporation ("Source").  Long Decl. ¶ 14; Pl.'s Mot., Ex. 2.  D&H informed Plaintiff that the Non-Compete prohibited Plaintiff from working for Source but proposed terms under which D&H would agree not to seek to enforce the Non-Compete.  Pl.'s Mot., Ex. 3.  The parties attempted to negotiate a resolution but failed to reach an agreement.  Pl.'s Mot., Exs. 3–4; Long Decl. ¶ 15; Defs.' Opp'n to Pl.'s Mot. for Summ. J. and Cross-Mot. for Summ. J. [hereinafter Defs.' Mot.] ¶ 12, Dkt. 7.

On July 22, D&H sent Plaintiff a letter stating that Plaintiff's "intention to work for Source . . . would be a direct violation of the [Agreement]." Pl.'s Mot., Ex. 2. The letter asserted that D&H "ha[d] proposed concessions to Source under which [D&H] would be willing to consent to [Plaintiff's] employment by Source" but "Source ha[d] not responded," and D&H "w[ould] be forced to take legal action . . . should [Plaintiff] proceed to work with Source or another competitor." *Id.*

### C.    Procedural History

On January 27, 2025, Plaintiff initiated this action through the filing of a Verified Complaint for Declaratory Relief (the "Complaint"). Dkt. 1. In its single count, the Complaint seeks a declaratory judgment that the Non-Compete is invalid and unenforceable as a matter of law.[5] Compl. ¶¶ 1, 27.

Defendants answered the Complaint on February 20. Dkt. 4. Thereafter, the parties cross-moved for summary judgment (the "Cross-Motions"). Dkts. 5, 8, 12–13. The Court heard oral argument on the Cross-Motions on November 19. Dkt. 17.

---

[5] Although the Complaint does not seek an injunction or other equitable relief, the Court has subject matter jurisdiction under 8 *Del. C.* § 111(a)(6). *See* Tr. of 11-19-2025 Oral Arg. on Cross Mot. for Summ. J.

## II.     ANALYSIS

The Court will enter summary judgment only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Ct. Ch. R. 56(c). Ordinarily, "[w]hen the Court is faced with cross-motions for summary judgment[,] the same standard must be applied to each of the parties' motions and the mere existence of cross-motions does not necessarily indicate that summary judgment is appropriate for one of the parties." *Baring v. Condrell*, 2004 WL 2340047, at *3 (Del. Ch. Oct. 18, 2004). But "[w]here the parties have filed cross motions for summary judgment and have not presented argument to the Court that there is an issue of fact material to the disposition of either motion, the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions." Ct. Ch. R. 56(h). Per Plaintiff, based on the absence of a dispute of material fact in the Cross-Motions, "[t]he parties have effectively stipulated this matter for a decision on the merits." Pl. William Brian Derge's Reply in Supp. of Mot. for Summ. J. and Answer to Defs.' Mot. for Summ. J. ¶ 2, Dkt. 12.

The parties have cross-moved for summary judgment on Plaintiff's request for a declaration that the Non-Compete is unenforceable as a matter of law. "While Delaware is a contractarian state, 'Delaware courts do not "mechanically" enforce

non-competes.'" *Hub Gp., Inc. v. Knoll*, 2024 WL 3453863, at *7 (Del. Ch. July 18,

2024) (quoting *FP UC Hldgs., LLC v. Hamilton*, 2020 WL 1492783, at *6 (Del. Ch.

Mar. 27, 2020)). Instead, Delaware courts "closely scrutinize[] [non-competes] as

restrictive of trade." *Faw, Casson & Co. v. Cranston*, 375 A.2d 463, 466 (Del. Ch.

1977).

### A.     The Standard

As a matter of framing, the parties disagree on whether the Court should

analyze the Non-Compete with the greater deference typically afforded to covenants

negotiated in the context of the sale of a business, or if a more searching inquiry

associated with employment agreements should apply. Defendants contend that the

Non-Compete was negotiated in connection with the Merger, and that prior cases

undertaking a more deferential analysis have enforced non-competes similar in

scope to that of the Non-Compete here. Plaintiff, on the other hand, maintains that

decisions addressing non-competes in the employment context are more apt, and

argues that past precedent in that context supports invalidating the Non-Compete.

When this Court considers "cases where an employee, in consideration of

future employment, is compelled to enter a contract not to compete," it must

carefully balance the value in "holding contracting parties to their promises and

enforcing their reasonable expectations" against "the encouragement of competition

and discouragement of restraints on trade, the recognition of an individual's right to choose her employment, and the desire to avoid oppressive or unclear obligations arising from contracts of adhesion." *Hub Gp.*, 2024 WL 3453863, at *1; *see also Del. Elevator, Inc. v. Williams*, 2011 WL 1005181, at *11 (Del. Ch. Mar. 16, 2011) (explaining that "[d]isparities in resources, bargaining power, and access to information" suggest "low to mid-level employees" do not "freely agree to restrictive covenants[,]" and "[t]he law recognizes these concerns by requiring a careful analysis of reasonableness before enforcing a non-compete").

By comparison, "covenants not to compete in the context of a business sale are subject to a 'less searching' inquiry than if the covenant 'had been contained in an employment contract.'" *Kodiak Bldg. P'rs, LLC v. Adams*, 2022 WL 5240507, at *4 (Del. Ch. Oct. 6, 2022) (quoting *Tristate Courier & Carriage, Inc. v. Berryman*, 2004 WL 835886, at *10 (Del. Ch. Apr. 15, 2004)); *see also Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at *19 (Del. Ch. July 22, 2015) (explaining that the "inquiry is less searching" "[i]f the restrictive covenant in question was obtained as 'part of a contract for the sale of stock'" (quoting *Tristate Courier*, 2004 WL 835886, at *10)). A non-compete must "protect the legitimate economic interests of the employer." *Kodiak Bldg. P'rs*, 2022 WL 5240507, at *8 (quoting *Rsch. & Trading Corp. v. Pfuhl*, 1992 WL 345465, at *12 (Del. Ch. Nov. 18, 1992)). In a sale, "[a]

buyer 'has a legitimate business interest in protecting the goodwill it purchased when it bought [the business], and the confidential information about [the business's] operations that [the seller] knows or could access.'" *Labyrinth, Inc. v. Urich*, 2024 WL 295996, at *23 (Del. Ch. Jan. 26, 2024) (quoting *Kodiak Bldg. P'rs*, 2022 WL 5240507, at *8, *11 (holding that an "acquirer has a legitimate economic interest with regard to the assets and information it acquired in the sale")).[6]  In addition to legitimately preserving the goodwill of the acquired business, restrictive covenants in connection with a sale are typically negotiated by parties with equal bargaining power, in circumstances where the restricted person has received material consideration for her promise not to compete. *See Labyrinth*, 2024 WL 295996, at *24 ("A sale of a business typically does not involve disparate bargaining power; that is why it is well-established that 'covenants not to compete in the context of a business sale are subject to a "less searching" inquiry.'  A bargain struck between equals carries less risk of one party complying out of fear." (quoting *Kodiak Bldg.*

_____

[6] *See also, e.g.*, *Concord Steel, Inc. v. Wilm. Steel Processing Co.*, 2009 WL 3161643, at *14 (Del. Ch. Sep. 30, 2009) (explaining that failing to enforce a non-compete negotiated in the sale of a business would "impair the goodwill" that the buyer purchased); *Vitalink Pharmacy Servs., Inc. v. Grancare, Inc.*, 1997 WL 458494, at *11 (Del. Ch. Aug. 7, 1997) (enforcing a non-compete that was "reasonably calculated to protect the value and goodwill of the purchased asset"); *cf. Pfuhl*, 1992 WL 345465, at *12 (enforcing a non-compete against high-level executives outside of the sale-of-business context because the company "has a legitimate interest in protecting from misappropriation the goodwill that . . . it has created").

*P'rs*, 2022 WL 5240507, at *4)); *see also Weil Hldgs. II, LLC v. Alexander*, 2025 WL 689191, at *4 (Del. Ch. Mar. 4, 2025), *aff'd*, 2025 WL 2993362 (Del. Oct. 23, 2025) (TABLE) (same); *FP UC Hldgs.*, 2020 WL 1492783, at *7 (explaining that in the sale of a business, "broader restrictions make sense" because "[t]he buyer has just paid handsomely for the business"); *id.* (declining to enforce a non-compete where, "[u]nlike cases involving the enforcement of non-competes following the sale of a business, the record . . . lack[ed] any evidence that [the restricted party] received substantial consideration in exchange for his commitment not to work in [the plaintiff's] industry anywhere in the United States"); *O'Leary v. Telecom Res. Serv., LLC*, 2011 WL 379300, at *5 (Del. Super. Jan. 14, 2011) (enforcing a non-compete where "[t]he [restricted parties] received substantial consideration for the sale of their business").[7]

---

[7] Deciding what level of deference to apply when analyzing a non-compete is not always black and white. In *Cleveland Integrity Services, LLC v. Byers*, for example, non-competes were included in a stock purchase agreement under which two restricted parties received over $12 million and $2.8 million, respectively, in the transaction. 2025 WL 658369, at *2 (Del. Ch. Feb. 28, 2025). The restricted period under the agreement ran for two years after the restricted parties' termination of employment with the acquired entity. *Id.* When the restricted parties left the acquired entity twelve years after closing, the Court expressed skepticism that "the Noncompete should retain the sale-of-a-business buffer," as it was no longer tailored to preserve the purchased goodwill. *Id.* at *10 n.129. As another "gray" example, in *Weil Holdings II*, the Court considered a non-compete in a limited liability company agreement that the restricted party signed in connection with a purchase of membership units. 2025 WL 689191, at *1. Affording some degree of greater deference, the Court took into account that the restricted party "willingly agree[d] to [the non-

In this case, Defendants argue that the Non-Compete was negotiated as part of the sale of a business and therefore warrants greater deference. The facts support Defendants' position. The Merger Agreement required TN Holdings to deliver at closing Restrictive Covenant Agreements from a list of Tanknology's top executives that included Plaintiff, Tanknology's COO. The Agreement is clear that Plaintiff accepted the restrictions therein, including the Non-Compete, "to induce [D&H] and [its merger subsidiary] to enter into the Merger Agreement and to consummate the transactions contemplated thereby," and would be "receiving substantial cash payments, significant benefits and other valuable consideration on the Closing Date" in exchange for his shares in the Merger. Agt. at 1; *see Kan-Di-Ki*, 2015 WL 4503210, at *18 n.225 ("The non-competition provisions [the plaintiff] seeks to enforce are found within, and were integral to, the agreements pursuant to which [the seller] sold the goodwill of his businesses, not within a separate employment agreement.").

Plaintiff argues that a more searching standard should apply because he did not negotiate the Merger and, as a stockholder owning less than 1% of the company's

---

compete] as part of an investment in which he held himself out as a sophisticated party, as opposed to simply accepting it as a precondition of employment." *Id.* at *5. In both cases, the Court concluded that the non-competes, even when afforded greater deference, were unenforceable.

shares, he could not have blocked the Merger. Yet Plaintiff did, in fact, execute a written consent approving the Merger, and could have declined to sign the Agreement. In any event, I am convinced that a more deferential review is required under this Court's precedents. First, in this context, the Non-Compete is designed to protect D&H's legitimate interest in preserving the goodwill of a business it acquired in a merger by preventing a C-suite executive with intimate knowledge of the business from competing. It is reasonable to expect that in the nine years Plaintiff served as Tanknology's COO, he developed knowledge of the company's operations, customers, and suppliers in all markets in which Tanknology operated. *See* Long Decl. ¶¶ 5–7 (explaining that Plaintiff "had responsibility over all service lines, including inspections, testing and parts distribution, as well as operation personnel," "directly oversaw" licenses to patented technology, "negotiated and managed vendor and supplier relationships, was the primary operational focal point for most customer relationships," and "was the primary person responsible for managing costs and customer pricing activities").[8] Second, nothing in the record suggests Plaintiff lacked equal bargaining power or that the Agreement was a contract of adhesion. And third, Plaintiff received substantial consideration—nearly

---

[8] Indeed, the Merger Agreement defined TN Holdings' "Knowledge" to include the knowledge of four individuals, including Plaintiff. Merger Agt. § 1.1.

$1 million—in a Merger that was conditioned on his agreement to the Non-Compete. *See O'Leary*, 2011 WL 379300, at *5 (finding non-compete enforceable where "[p]laintiffs received substantial consideration" when they sold their business for $1 million).[9] These facts, in the aggregate, require greater deference to the Non-Compete than would be appropriate in the employment context.

### B. The Non-Compete Is Not Unenforceable As A Matter Of Law.

Under Delaware law, non-competes are enforceable only when they "(1) [are] reasonable in geographic scope and temporal duration, (2) advance a legitimate economic interest of the party seeking its enforcement, and (3) survive a balancing of the equities." *FP UC Hldgs.*, 2020 WL 1492783, at *6 (alteration in original) (quoting *Lyons Ins. Agency, Inc. v. Wilson*, 2018 WL 4677606, at *5 (Del. Ch. Sep. 28, 2018)).

#### 1. The Geographic Scope And Duration Of The Non-Compete Are Reasonable Under The Circumstances.

Geographic scope and duration must be considered together. "All else equal, a longer restrictive covenant will be more reasonable if geographically tempered,

---

[9] *See also Kan-Di-Ki*, 2015 WL 4503210, at *20 (enforcing a non-compete because the purchaser was entitled to protection of goodwill after it "paid $4 million and then roughly $300,000" to acquire the businesses); *cf. Tristate Courier*, 2004 WL 835886, at *13 (finding the equities weighed in favor of enforcing a non-compete where the restricted party "[wa]s to receive $150,000 for subjecting himself to the [c]ovenant").

and a restrictive covenant covering a broader area will be more reasonable if temporally tailored." *Del. Elevator*, 2011 WL 1005181, at *8. The duration and geographic scope of the Non-Compete, taken together, are reasonable under the circumstances of this case.

First, the Restricted Period in the Non-Compete runs for a period of five years. Because that period began on the closing date of the Merger, approximately four years remained at the time of Plaintiff's departure. "Non-competition agreements of that length . . . have been found reasonable by Delaware courts in cases where the restrictive covenant is executed as part of the sale of a business as a going concern." *Kan-Di-Ki*, 2015 WL 4503210, at *19 (enforcing a five-year non-compete); *see also Tull v. Turek*, 147 A.2d 658, 663–64 (Del. 1958) (enforcing a ten-year non-compete); *O'Leary*, 2011 WL 379300, at *5 (enforcing a four-year non-compete that covered the entire United States); *Hough Assocs., Inc. v. Hill*, 2007 WL 148751, at *14 (Del. Ch. Jan. 17, 2007) (enforcing a five-year non-compete).

Second, the Territory in the Non-Compete covers "the United States and each other country in which [TN Holdings or its subsidiaries] generated revenue in the two . . . year period prior to [June 30, 2023]." Agt. § 1(v). Although that geographic reach is expansive, it is reasonable where, as here, "the covenant appropriately covers the market where the covenantee has economic interests." *Intertek Testing*

*Servs. NA, Inc. v. Eastman*, 2023 WL 2544236, at *5 (Del. Ch. Mar. 16, 2023)

("'[T]he reasonableness of a covenant's scope is not determined by reference to

physical distances' but by 'the area in which a covenantee has an interest the

covenants are designed to protect.'" (alteration in original) (quoting *Weichert Co. of

Pa. v. Young*, 2007 WL 4372823, at *3 (Del. Ch. Dec. 7, 2007))). The record here

shows that Tanknology conducted business across the United States and

internationally, and that, as COO, Plaintiff had responsibility over operations across

all markets. Thus, Defendants have a legitimate business interest in the protected

area.

Taken together, the temporal and geographic scope of the Non-Compete,

under the circumstances here, is not unreasonable, and Plaintiff identifies no on-

point authority to the contrary. Plaintiff's primary argument is that in the

employment context, a similarly expansive non-compete would require "exceptional

justification." Pl.'s Mot. ¶ 17. But again, the Non-Compete was not negotiated in

the employment context; it was signed as part of the sale of a business.

> ## 2. The Non-Compete Is Tailored to Protect Defendants' Legitimate Interests.

The Non-Compete legitimately protects Defendants' interests, "includ[ing]

protection of employer goodwill, and protection of employer confidential

information from misuse." *Kan-Di-Ki*, 2015 WL 4503210, at *20. By bargaining

for Restrictive Covenant Agreements from top executives (including Plaintiff) in connection with the Merger Agreement, D&H sought to protect its legitimate economic interest in maintaining the business relationships TN Holdings had with its vendors, suppliers, and customers. "The Restrictive Covenants [Defendants] obtained therefore served a legitimate purpose for [them], and by seeking to enforce the terms of those Covenants, [Defendants] ha[ve] not exceeded the scope of that legitimate interest." *Id.*

Plaintiff argues, in conclusory fashion,[10] that the definition of Restricted Business is overbroad and exceeds the scope of any legitimate interest Defendants might have. The Restricted Business includes "all or any portion of the business" conducted by TN Holdings or its subsidiaries at a discrete point in time. Agt. § 1(iii). Nothing in the record suggests that the scope of the Restricted Business, as defined in the Agreement, is broader than the business or services that TN Holdings or Tanknology actually provided at the time of the Merger, and Plaintiff makes no other

---

[10] *See* Pl.'s Mot. ¶ 1 (describing the Non-Compete as "business unlimited" but failing to explain how that is the case); *id.* ¶ 9 (asserting that the Non-Compete is "overly broad as to . . . 'Restricted Business'" but not explaining why); *id.* ¶ 16 (arguing that Restricted Business "is broadly defined" and "includes five broad general business categories," but not that those categories are broader than TN Holdings and Tanknology's actual business).

specific argument for why the definition of Restricted Business is overbroad or otherwise unenforceable.

### 3. The Equities Support Enforcement.

The Non-Compete survives a balancing of the equities. "[T]here is nothing inequitable about allowing [Defendants] to enforce . . . Restrictive Covenants according to the terms for which [the parties] bargained." *Kan-Di-Ki*, 2015 WL 4503210, at *20. Plaintiff has not identified any equitable considerations that militate against enforcing the Non-Compete, for which Plaintiff received nearly $1 million in consideration.

## III. CONCLUSION

For the reasons explained above, Plaintiff's motion for summary judgment is DENIED and Defendants' motion for summary judgment is GRANTED.

Sincerely,

*/s/ Bonnie W. David*

Bonnie W. David
Vice Chancellor

cc: All counsel of record (by File & ServeXpress)